1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9
10

LINDA SCHUMACHER, et al.,

CASE NO. C18-5535 MJP

11

Plaintiffs,

ORDER DENYING PLAINTIFFS'
MOTION TO CERTIFY CLASS

12

v.

AND APPOINT FREEDOM
FOUNDATION AS CLASS

13

GOVERNOR JAY INSLEE, et al.,

COUNSEL

14

Defendants.

15
16      This matter comes before the Court on Plaintiffs' Motion to Certify a Class and Appoint

17   the Freedom Foundation as Class Counsel.  (Dkt. No. 65.)  Having read the motion, the

18   Response (Dkt. No. 68), the Reply (Dkt. No. 73), and the related record, the Court DENIES the

19   Motion.

20                                      **BACKGROUND**

21      Plaintiffs are Individual Providers ("IPs") who care for disabled or elderly individuals

22   enrolled in Washington's Medicaid-funded homecare program.  (Dkt. No. 47, Second Amended

23
24

1    Complaint ("SAC"), ¶ 2.)  Defendant, the Service Employees International Union 775 (the

2    "Union"), represents Plaintiffs in collective bargaining with the State of Washington.  (Id.)

3         Prior to July 2014, the collective bargaining agreement ("CBA") between the State

4    and the Union generally required all IPs to pay Union dues or nonmember fees, unless they had a

5    bona fide religious objection.  (Dkt. No. 72, Declaration of Adam Glickman ("Glickman Decl."),

6    ¶¶ 3-4.)  Following the Supreme Court's decision in Harris v. Quinn, 573 U.S. 616 (2014), which

7    found these mandatory, "fair share" dues violated the First Amendment rights of non-members,

8    the State and the Union renegotiated their CBA so that IPs who did not wish to join the union or

9    pay union dues could opt out of doing so.  (Glickman Decl., ¶ 6.)

10        In 2018, however, the Supreme Court concluded that this opt-out arrangement for

11   deducting non-mandatory union dues from public employees is not constitutionally permissible.

12   Janus v. AFCME, Council 31, 138 S.Ct. 2448 (2018) (prohibiting deduction unless "employees

13   clearly and affirmatively consent").  Following the Supreme Court's decision in Janus, the State

14   of Washington and the Union stopped deducting fees unless the IP granted affirmative consent to

15   such deductions.  A Class of IPs consisting of those "who, during the period February 11, 2011

16   through February 11, 2019, paid dues or fees to SEIU 775 through payroll deductions . . .

17   without a signed Union membership/dues authorization card in effect at the time of the

18   deduction" was certified by this Court in April 2020.  Routh v. SEIU 775 Healthcare NW, Case

19   No. C14-200 MJP, Dkt. Nos. 253-254.  The Class settled for $3,250,000.  Id., Dkt. No. 255.

20        In this case, the proposed Class consists of approximately 84 IPs who opted out of the

21   Court-approved settlement in Routh.  The Plaintiffs here define the putative class as:

22        [A]ll individuals: 1) who are or were Providers as defined in the complaint; 2) from
          whom the State has deducted union dues and/or dues-equivalent fees and remitted
23        them to SEIU 775; 3) who did not provide clear, prior, affirmative consent for such
          deductions or union membership; 4) who objected to union membership and the

24

payment of any union dues/fees; and 5) who were subjected to the Defendants'
scheme outlined in RCW 41.56.113(1)(b)(i) and CBA art. 4.1. The class includes
everyone who comes within the class definition at any time within the relevant statute
of limitations.

(SAC, ¶ 35.)

The four named Plaintiffs allege that they did not sign Union membership or dues

deduction agreements, are not Union members, did not consent to withdrawal of Union dues or

fees from their wages, and object to positions the Union "maintains during collective bargaining,

as well as issues and candidates supported by [the Union]."  (Id., ¶¶ 3, 31.)  Yet some members

of the proposed Class have participated in Union activities, signed Union cards, and are current

Union members.  (Glickman Decl., ¶¶ 14-17, Ex. A-C.)  Six potential Class members opted out

for personal financial concerns.  Four opted out because they planned to work as IPs only for a

short time.  (Id., ¶ 15.)  One opted out because she had minimal time to participate in the Union

and another because she was not interested in Union activities.  (Id.)  Some who opted out did so

after participating in member-only activities.  (Id.)

Plaintiffs now move to certify a Class that includes all these individuals and to appoint

the Freedom Foundation as Class counsel.  The Union objects, arguing, inter alia, that the

Plaintiffs are not adequate Class representatives and the Freedom Foundation's troubling history

of purchasing stolen information about IPs, discussed infra, means neither Plaintiffs nor their

counsel are adequate Class representatives.  The Court agrees.

**DISCUSSION**

I.      **Legal Standard**

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348

(2011) (citation and internal quotation marks omitted).  To qualify for this exception to the

general rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the absent class members.  Id.  Class certification is proper if and only if "the trial court is satisfied, after a rigorous analysis," that Plaintiffs have met their burden under Rule 23.  Id. at 2551.

Proponents of class certification must demonstrate, first, that:

> (1) the class is so numerous that joinder of all members is impracticable ("numerosity"),
>
> (2) there are questions of law or fact common to the class ("commonality"),
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"), and
>
> (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").

See Fed. R. Civ. P. 23(a).

Next, proponents of certification must demonstrate that they meet the requirements of at least one of the class types described by Rule 23(b).  Here, Plaintiffs rely on Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members" ("predominance") and a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy" (superiority).  Because the Court finds that Plaintiffs and their proposed Class counsel are not adequate representatives, the Court does not reach the Rule 23(b)(3) requirements for class certification.

## II.    Plaintiffs' Motion for Certification

Of the four Rule 23(a) requirements, the Union only challenges adequacy.  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To determine whether the adequacy prong is satisfied, courts consider two questions: "(1) Do the representative plaintiffs and their counsel have any conflicts

of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003).  "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998).

The Union argues that Plaintiffs cannot satisfy this requirement because: (1) The proposed Class contains current Union members as well as Union opponents, creating an intra-class conflict; (2) Plaintiffs who seek refunds of Union dues cannot adequately represent agency fee payers; (3) Plaintiffs Robb and Surena Isreal are not adequate class representatives because the factual circumstances of their claims are unique; (4) Plaintiff Miranda Thorpe is not an adequate class representative because res judicata bars her claims; and (5) the Freedom Foundation's attorneys have engaged in repeated misconduct that prohibits them from being appointed as Class Counsel.  (Dkt. No. 68 at 3.)

As an initial matter, the Court addresses two of the Plaintiffs arguments that are ancillary to the central issues of intra-class conflict, discussed infra.  First, the Union argues that Plaintiffs lack standing to represent the interests of potential Class members who paid agency fees under the pre-Harris agency fee system in place before 2014.  (Dkt. No. 68 at 19.)  Plaintiffs provide no response to this argument (see Dkt. No. 73), and because Plaintiffs allege harm caused by the "unconstitutionality of the [Union's] opt-out scheme" (SAC, ¶ 32), and the dues collection process was not "opt-out" before Harris, the Court concludes that Plaintiffs have failed "to demonstrate that the class members 'have suffered the same injury,'" as required for class certification.  Wal-Mart, 564 U.S. at 350 (quoting Southwest v. Falcon, 457 U.S. 147, 157 (1982)).

1   Second, because the Union does not challenge the adequacy of Linda Schumacher to

2   represent the class, and "the adequacy-of-representation requirement is satisfied as long as one of

3   the class representatives is an adequate class representative" Local Joint Exec. Bd. of

4   Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1162 n.2 (9th Cir. 2001),

5   the Court need not address the Union's challenge to the adequacy of the other individual

6   Plaintiffs, based on their unique allegations.  See also Chambers v. Whirlpool Corp., 980 F.3d

7   645, 670-71 (9th Cir. 2020) ("[T]he presence of 13 adequate class representatives renders moot

8   any challenge to the adequacy of Chambers.").

9   Nevertheless, the Court finds that the Plaintiffs and their counsel have pervasive conflicts

10  of interest with members of the proposed class and therefore cannot represent the Class without

11  serious risk of harm to absent members.

12  1.   Intra-Class Conflict

13  The Union contends that because the Plaintiffs are Union opponents (see, e.g., SAC,

14  ¶ 31), but 12 out of the approximately 84 members of the proposed Class are current members of

15  the Union, there is an impermissible intra-class conflict.  (Dkt. No. 68 at 18.)  The Court agrees.

16  This issue was addressed in Routh, where the Court held that a class definition creating a similar

17  conflict rested on the plaintiffs' erroneous assumption that:

18      '[S]omeone who does not want to give money to the Union 'do[es]
        not . . . support' the Union. [However] even though money can be a form of
19      'support' and indeed, a form of speech under the First Amendment, it is not clear
        that withdrawal of money necessarily means withdrawal of support such that prior
20      monetary contributions must be interpreted as First Amendment injuries.

21  Hoekman v. Educ. Minnesota, 335 F.R.D. 219, 245 (D. Minn. 2020) (quoting Routh, Dkt. No.

22  165 at 8).

23

24

1        Plaintiffs argue that the Union's pre-2018 dues collection system is unconstitutional and

2    therefore the fact that some Class members "'might prefer to leave violation of their rights

3    unremedied'" . . . "should not mean that those who wish to seek redress are prevented from so

4    doing."  (Dkt. No. 73 at 7 (quoting Mayfield v. Dalton, 109 F.3d 1423, 1427 (9th Cir. 1997).)

5    But Plaintiffs have identified the wrong issue; the question is not whether they are prevented

6    from seeking redress, but whether they are adequate representatives of the Class.  Further, the

7    single Ninth Circuit case Plaintiffs cite supports the Union's position that the Plaintiffs cannot

8    represent those who approve of the Union and its activities.  In Mayfield, where the named

9    plaintiffs were members of the military required to provide DNA samples, the court found an

10   impermissible intra-class conflict with class members "who did not oppose the repository, and

11   who, in fact, approved of it and wished the policies fully enforced."  109 F.3d at 1427.

12       Many members of the proposed Class here have taken actions showing Union support,

13   even after opting out of paying dues.  Of the approximately 84 IPs who fall within the proposed

14   Class definition, 19 signed Union membership cards after objecting to payroll deductions; 12 are

15   current Union members; six explained that they opted out solely for personal financial concerns;

16   four opted out because they planned to work as an IP only for a short time longer; and one opted

17   out because she did not have time to participate in Union activities.  (Glickman Decl., ¶¶ 14-16.)

18   Plaintiffs, Union opponents, cannot adequately represent members of the proposed class who

19   support the Union and its goals.  "These two groups 'have potentially divergent aims. The first

20   wants to weaken and if possible, destroy the union; the second, a free rider, wants merely to shift

21   as much of the cost of representation as possible to other workers, i.e., union members.'"  Littler

22   v. Ohio Ass'n of Pub. Sch. Employees, No. 2:18-CV-1745, 2020 WL 1861646, at *9 (S.D. Ohio

23

24

1  Apr. 14, 2020) (quoting Gilpin v. Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO, 875 F.2d

2  1310, 1313 (7th Cir. 1989).).

3       2.  Plaintiffs' Attorneys Cannot Serve as Class Counsel

4       Proposed Class counsel, the Freedom Foundation, also has pervasive conflicts of interest

5  with the Class because they recently purchased stolen information about IPs and engaged in a

6  conspiracy with a former client that led to his criminal conviction.  In appointing class counsel,

7  the Court may consider any matter pertinent to counsel's ability to fairly and adequately

8  represent the interests of the class.  Fed. R. Civ. P. 23(g)(1)(B).  It is clear the Freedom

9  Foundation is unable to do so in this case.

10      Twice in the last five years the Freedom Foundation has been fined for its role in

11  purchasing stolen information about IPs.  In one incident, the Foundation paid a non-profit

12  employee $12,000 for two electronic spreadsheets stolen from his employer.  SEIU Healthcare

13  Nw. Training P'ship v. Evergreen Freedom Found., 5 Wash. App. 2d 496, 499 (2018).  The

14  Foundation downloaded the data, including individual contact information, into its electronic

15  database, and used the records to contact IPs.  Id.

16      More recently, on November 24, 2020, the King County Superior Court entered a

17  $164,355.28 final judgment against the Freedom Foundation for engaging in a civil conspiracy

18  with a former client through trafficking, converting, and wrongfully possessing IP data

19  (including contact information) stolen from the Union.  See SEIU 775 v. Evergreen Freedom

20  Foundation, King County Superior Court, Case No. 16-2-12945-5 SEA.  The Foundation does

21  not deny it purchased this stolen information for $2,000 from a former client but excuses the

22  behavior by explaining that three months had passed since the Foundation represented this

23  particular client.  (Dkt. No. 73 at 12; Dkt. No. 74, Ex. 3, ¶¶ 8, 11.)  Further, before purchasing

24

the stolen material, James G. Abernathy, a Foundation attorney who has entered an appearance in this matter, advised his former client of "the potential legal risks of sharing information without authority to do so." (Dkt. No. 73 at 12.) Nevertheless, on June 12, 2019, Mr. Abernathy's former client was convicted of Conspiracy to Commit Trafficking in Stolen Property in the Second Degree for selling stolen information to the Foundation. (Dkt. No. 70, Ex. E at 2.)

Based on the Foundation's recent history of stealing the private information of IPs, the Court cannot appoint the Foundation to represent these same individuals. The Freedom Foundation cannot obtain access to Class information or conduct discovery on behalf of the Class when doing so would allow it to obtain the very same information it was just sanctioned for stealing. Further, the Foundation's conspiracy with their former client—which ended in his criminal conviction—coupled with the Foundation's anemic explanations for their conduct towards him, do not give the Court confidence that the Foundation's attorneys understand their ethical obligations to clients. See Creative Montessori Learning Centers v. Ashford Gear LLC, 662 F.3d 913, 918 (7th Cir.2011) ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class.").

## CONCLUSION

Finding that Plaintiffs and their counsel have not demonstrated that they can adequately represent the proposed Class, the Court DENIES Plaintiffs' Motion.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 17, 2021.

Marsha J. Pechman
United States Senior District Judge